IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DOCK TYRONE MURRAY, JR., | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:16-cv-3305-L (BT) |
| | § | |
| LORIE DAVIS, *Director*, TDCJ-CID, | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Petitioner Dock Tyrone Murray, Jr., a Texas prisoner, filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. The District Court referred the resulting cause of action to the United States magistrate judge for pretrial management, pursuant to 28 U.S.C. § 636(b). For the following reasons, the Court should DENY the petition.

## I. Procedural Background

A jury convicted Petitioner on three counts of aggravated robbery, enhanced. *State of Texas v. Dock Tyrone Murray.*, Nos. F-1145384-V, F-1145385-V, F-1145386-V (292nd Jud. Dist. Ct., Dallas County, Tex., Jan. 10, 2013). Petitioner was sentenced to fifty-five years in prison for each conviction, to run concurrently. After a hearing, the trial court denied Petitioner's motion for new trial.

On June 9, 2014, the Fifth District Court of Appeals affirmed

Petitioner's convictions and sentences. *Murray v. State*, Nos. 05-13-00070-CR, 05-13-00084-CR, 05-13-00090-CR (Tex. App. – Dallas, 2014). On October 1, 2014, the Court of Criminal Appeals refused Petitioner's petitions for discretionary review. PDR Nos. 905-14, 906-14, 907-14. On February 23, 2015, the Supreme Court denied a writ of certiorari.

Petitioner filed three state petitions for writ of habeas corpus. *Ex parte Murray*, Application Nos. 85,361-01, -02, -03. On October 26, 2016, the Court of Criminal Appeals denied the petitions without written order on the findings of the trial court.

On November 17, 2016, Petitioner filed the instant § 2254 petition, in which he alleges:

1.    He received ineffective assistance of counsel when:

    (a)    Counsel failed to object to extraneous offense evidence at punishment;

    (b)    Counsel left a discovery packet with a jailer who was a potential State's witness;

    (c)    Counsel had conflict of interest due to a romantic relationship with the prosecutor;

    (d)    Counsel left the courtroom during trial; and

    (e)    Counsel failed to present material evidence as instructed;

2.    The trial court erred in denying his challenges to three jurors;

3.    He is actually innocent due to insufficient evidence; and

4.    The prosecution suppressed evidence in violation of *Brady*.

## II. Factual Background

The state court of appeals meticulously summarized the facts underlying

Petitioner's criminal convictions. The following facts are taken from the state

appellate decision:

> On the evening of Tuesday, December 21, 2010, at around 8:30 p.m.,
> Sheresa Tuggle and a friend from California, Kyle Shubel, visited the
> Zone D'Erotica adult lingerie and novelty store on Central
> Expressway at Spring Valley Road in Richardson, Texas. Tuggle and
> her friend were browsing the t-shirts when she noticed three men
> enter the store—a white male, a Hispanic male, and a black male.
> Tuggle noticed the men were wearing heavy coats, which seemed odd
> since it was unseasonably warm that day. The Hispanic male moved
> towards her and told her to go to the counter, where he took the
> money out of her purse. When she told him to put it back, the white
> male, who by that point was standing behind the counter, told her to
> face the wall. In addition to approximately $130 in cash, the
> Hispanic male took Tuggle's driver's license, the key to her truck,
> and a couple of house keys. The black male took Shubel's watch and
> Blackberry. Tuggle testified that after the men took their belongings,
> she and her friend were told to go into a back room and lay face
> down on the carpet. She noticed that the cashier, who was forced to
> lie down on the ground with them, was very upset. The cashier
> begged the men not to kill her and repeatedly told them she had two
> children. One of the men replied that if she wanted her children to
> have a "happy Christmas," she should stay on the floor and do what
> she was told. Tuggle got up when she thought she heard the three
> men leave the store. After making sure they were gone, she and
> Shubel used a fax machine to call 911.
>
> Shubel testified that he and Sherry Tuggle were looking at t-shirts at
> the Zone D'Erotica when a black male wearing a bulky coat
> approached him and told him to move over to the counter. When
> Shubel hesitated to move towards him, thinking it was store security
> or perhaps a joke, the individual gestured towards his right hand.
> Shubel could see he had a pistol. Shubel said he was familiar with
> firearms because he had been an NRA member for nearly two
> decades and produced video games that required him "to do a
> significant amount of research on profiles and appearance of
> firearms." The gun he saw was not a toy, and he thought it looked

like an 82 Beretta. He said that once they got to the counter, the black male began frisking him, taking his Blackberry, his wallet, and his watch. After the men went through the cash register and Tuggle's purse, they took them to the back room and told them to lay on the ground. He said the men asked for the tapes from the store's video surveillance system and when they were told it was a "satellite surveillance system," they threw the computer monitor to the ground. Shubel recalled that the store's cashier, who was with Shubel and Tuggle in the back room, "was noticeably afraid and freaking out."

Tera Mitchell, the cashier who was working at the Zone D'Erotica on the night of the robbery, testified that she saw three men—a white male, a black male, and a man who appeared to be Hispanic—enter the store at approximately 8:30 p.m. She was talking to the white male in a "caged" or "sectioned" area at the back of the store (which contained pornographic videos and various adult devices) when she noticed he was wearing a jacket, shorts, and black gloves, which was odd given the warm weather. She became suspicious and returned to the register and removed the money from that day and hid it, leaving $50 in the register. Eventually, the white male went over to the counter, climbed over it, and opened the register. He took the money from the cash register and went through Mitchell's purse, taking her "money and stuff." She did not see the two customers in the store until she was told to go to the back room. She said the black male had a tattoo scar under his eye and was the one holding the gun when they were in the back room. The only thing he said to her was that if she did not cooperate "no one would have a Merry Christmas." When they were in the back room, the robbers also ordered Mitchell to open the store safe. She told them that she could not do that but she "could call someone and get it open for them." Mitchell testified that the robbers "didn't want to do that."

Tuggle, Shubel, and Mitchell all identified appellant from photographic lineups and in court as the black male who participated in the robbery. On the night of the robbery, Tuggle was shown photographic lineups but was unable to identify anyone. Nine days later, on December 30, 2010, she was shown another photographic lineup and identified all three individuals involved in the robbery, but testified she was only "about 50 percent" certain of her identification of appellant as the black male she saw because his back was turned to her almost the entire time and she rarely saw his face. Tuggle remembered, however, that the bridge of his nose "was

distinctive with the eyes." The morning that she testified in court, Tuggle viewed a photographic lineup and identified appellant in court as one of the individuals who committed the robbery. After Tuggle identified appellant, the in-store video surveillance footage was played for the jury. Watching the video footage from one of the store's surveillance cameras, she noted that a black male wearing an orange baseball cap could be seen "meandering" around the store shortly before the robbery, and that the same video feed later showed him holding a gun. Shubel testified that when he selected appellant's photograph from the lineup, he was "[i]n excess of 50 percent" sure of his identification of the man because he had gotten a good look at his face. Shubel also identified appellant in court. Mitchell testified that she did not identify anyone in the first photo lineup the police showed her but did make an identification from a photo lineup shown to her on December 30, 2010, and she testified she was "a hundred percent sure" of her identification. She identified appellant in court as the black male she saw in the store that day.

The lead detective in the case was Adam Perry, with the Richardson Police Department's Crimes Against Persons (CAPERS) unit. He testified that he interviewed the three complaining witnesses (Mitchell, Shubel, and Tuggle), viewed the video surveillance footage, consulted a database of law enforcement agencies for assistance in identifying suspects, and decided to release the surveillance video to the media. Following the media release, the Richardson Police Department received several tips identifying the white male suspect in the surveillance footage as Tommy McClendon. About one week later, a jailer at the Dallas County Jail contacted the Richardson police and identified the Hispanic suspect as Eric Ellis. Perry examined Ellis's driver's license and jail book-in photos, and found him to be the "spitting image" of the Hispanic individual seen in the surveillance footage. After Tera Mitchell identified Ellis in a photographic lineup as one of the suspects— Perry noted Ellis was "light complected" and had a receding hairline and a mole on the top of his head—Perry obtained a warrant for Ellis's arrest.

The Richardson police soon learned Ellis's mother lived in Farmers Branch. Perry went to the mother's residence along with officers from the Farmers Branch Police Department. When the officers knocked on the door, Ellis answered. Perry immediately recognized Ellis and took him into custody.

Ellis was transported to the Richardson Police Department, where Perry read him his *Miranda* rights and interviewed him. During the interview, Ellis admitted to his involvement in the Zone D'Erotica robbery and provided information regarding appellant. He told Perry that he, appellant, and the white male suspect, who he knew as "White Chocolate" (he did know the individual's real name), committed the robbery. He positively identified appellant as the black male suspect in the robbery. Ellis also told Perry that appellant's last known address was a Budget Suites motel in Lewisville.

Ellis received a telephone call from appellant while he was being interviewed by Perry. Perry asked Ellis to set up a meeting with appellant at Ellis's mother's house in Farmer's Branch. Appellant was arrested on the street where Ellis's mother lived. Brent Gibson, at that time a Richardson Police Department detective, testified that when police officers searched Ellis's mother's house—they had a search warrant and entered with her consent—they found clothing matching that worn by Ellis during the robbery and an item (a vibrating sex toy) taken from the store during the robbery. During his interview with Perry, appellant denied any involvement in the Zone D'Erotica robbery. Appellant admitted the individual in the surveillance video looked like him, but it was not him. He also told Perry that it looked like someone he knew named "Sleepy." But appellant provided no information on "Sleepy" and Perry could find no one by that name in the police department's gang database.

Ellis had originally told Perry that appellant was at a Budget Suites motel in Lewisville, but officers soon learned Ellis was not sure of the motel's location. Following a "process of elimination," the officers looked at Budget Suites in the area and eventually discovered that the motel they were looking for was actually in "The Colony." A security guard at the Budget Suites recognized Tommy McClendon's photograph and told officers which room he was staying in. The officers notified Perry and conducted surveillance of the motel room, which was rented in McClendon's name, until they had an arrest warrant. When McClendon had rented the room, he listed appellant's wife, Misty Murray, as his emergency contact and described her relationship as "mom." After obtaining arrest and search warrants, the officers went to the room and found McClendon and Misty Murray inside. The officers' search of the motel room recovered

a BB gun, clothing matching that worn by McClendon during the robbery, gloves and shoes similar to those worn by McClendon during the robbery, an identification card for appellant, another pair of shoes, pornographic videos, and sex toys.

Perry also testified that a ZTE Metro PCS cell phone was obtained from appellant at the time of his arrest. The phone was registered to Misty Murray. Images taken by the cell phone included a photograph of McClendon and appellant with appellant wearing an orange hat similar to an orange baseball cap worn by one of the suspects in the Zone D'Erotica surveillance footage. Other photos showed various tattoos on appellant, and there was a photo of appellant sitting on a couch at the Budget Suites motel.

Michael Bosillo, the custodian of records at Metro PCS, testified that he reviewed the records for the subscribers Eric Ellis and Misty Murray on their calls made on December 21, 2010. He said that the records showed cellular phone calls between Ellis's number and Murray's number throughout that day. One call made at 8:45:01 p.m. involved Ellis calling Murray's phone using a cell tower near the offense location in Richardson. At 8:50:22 p.m., Murray called Ellis using the same cell tower (the call went to voicemail). At 8:50:35, Murray called Ellis via the same location. At 8:51:52 and 8:58:39 p.m., the Murray phone used the same cell tower. Subsequent calls showed that Ellis's phone moved from the cell tower near the offense location to one in the Farmers' Branch area, and then subsequently to a cell tower in The Colony.

Laura Fleming, a firearms examiner with the Southwestern Institute of Forensic Sciences (SWIFS), testified that the BB gun found by the Richardson police, a Daisy Power Line Model 15 XT, had warnings that it was not a toy and that misuse of the item could result in serious injury or death. Her testing showed the BB gun was in good working order. She also noted that it looked like a real firearm. Unlike some air guns that are sold on the market, it did not have an orange tip to indicate it was not a firearm. Flemings testified that the BB gun could cause serious injury or death and could be a deadly weapon, although "there are so many variables when it comes to air guns as to what can happen, but the potential is certainly there." On cross-examination, she acknowledged the BB gun was an air gun rather than a firearm.

Tommy McClendon testified for the State that, at the time of the robbery, he had been living with appellant and appellant's wife at the Budget Suites in The Colony for approximately three weeks. On the night of December 21, 2010, a girl named Cara picked up McClendon and appellant at the motel and drove them to Farmer's Branch, where they picked up Ellis. They drove around "looking for someone to rob." McClendon testified that he was wearing a black hoodie with "gold designs on it," blue jean shorts, and (so he would leave no fingerprints) black gloves. Ellis wore a black hoodie with white lettering on it. Appellant was wearing "a burnt orange Texas hat with a 'T' on it," a striped polo shirt, a black jacket, and jeans.

When they arrived at the Zone D'Erotica, McClendon went into the store with Ellis to look around, pretending to be customers. They saw an employee and two customers. Ellis called appellant on his cell phone. Appellant entered the store and walked around, acting like a customer. McClendon engaged the cashier in conversation about sexual toys and went with her into the rear or "caged" part of the store to look at merchandise. He returned to the counter as if he was going to buy the items he selected. Meanwhile, appellant, who was still walking around the store, passed by McClendon and asked him what he was waiting for. With the cashier behind the counter, McClendon jumped over the counter, grabbed the back of the cashier's shirt, and told her to open the cash register. He took money from the register and the cashier's purse. While this was going on, Ellis and appellant approached the two customers in the store and took items from them.

The three men took the employee and two customers into a back office of the store and ordered them to lay down on the floor. Appellant kept an eye on them while McClendon tried, unsuccessfully, to remove the unit that contained the store's video surveillance system. McClendon testified that he did not know appellant had a handgun and never saw him with a gun during the robbery, but had seen him with a BB gun two or three days earlier at the Budget Suites motel. McClendon testified that they took pornographic DVDs and "toys" from the store. Afterwards, they returned to Ellis's mother's house in Farmer's Branch and divided the items and the money.

McClendon, twenty years old at the time of trial, told the jury he had pleaded guilty to the three offenses in this case and, if he testified truthfully, would receive a sentence of eight years' imprisonment. He

testified that he had been incarcerated as a juvenile following a November 2007 conviction for aggravated sexual assault of a child, and that in October 2009 he was convicted of criminal mischief and served a one-year sentence in state jail. McClendon said he did not know anyone named "Sleepy." He identified four handwritten letters (State's exhibits 86, 87, 88, and 89) he had received that were written and signed by appellant. McClendon testified that, in those letters, appellant professed his innocence and asked for McClendon's help in clearing his name. Appellant told McClendon to contact appellant's attorney and investigator and tell them he would testify in court that "Sleepy" was the person seen in the video. McClendon admitted he wrote to appellant indicating he was willing to "take the rap" for appellant, but he did that only because appellant "kept on pressuring" him, and that he was intimidated by or scared of appellant. McClendon testified that appellant masterminded the robbery and was the one calling the shots. McClendon said on cross examination that he did not recall telling the police "[t]here is no mastermind." On redirect, he clarified that he did not realize until later appellant had a gun during the robbery. He testified further that in the second of the four letters, exhibit 87, appellant told him what he wanted him to write.

Eric Ellis testified that he was at his mother's house on December 21, 2010, when appellant called him and asked him if he "was ready to go make some money," which meant rob a store. Appellant, McClendon (Ellis knew him as "White Chocolate"), and a woman whose name Ellis did not know picked up Ellis at his mother's house in Farmers Branch. They left his mother's house and drove through North Dallas, eventually ending up in Richardson. Ellis believed appellant may have chosen the Zone D'Erotica store at random: "It was just, we were just driving around and it was a random place that was picked." But Ellis acknowledged that the store's convenient location, which provided easy access to the nearby service road, was also a factor.

At the Zone D'Erotica, Ellis and McClendon went inside the store and reconnoitered it, pretending to be customers. As they waited for the customers to leave, appellant called Ellis's cell phone and asked him "how it looked." Ellis told appellant there were two customers in the store and suggested they wait for the customers to leave, but appellant ignored Ellis's advice and entered the store "shortly after" that. The next thing Ellis recalled was McClendon jumping over the counter and appellant pointing to the female customer and telling

Ellis, "Get her." Ellis removed some money from the woman's purse while appellant took the male customer's wallet and phone. McClendon took the cashier's purse. Ellis testified he was not carrying a weapon during the offense and that he covered his hands with his sweatshirt in order to avoid leaving fingerprints. He said that he saw appellant with a gun inside the store after McClendon jumped over the counter, but did not know if the gun was real. He admitted previously telling the prosecutor that he had not seen the gun, but stated that he now remembered seeing it "[b]ecause a sufficient amount of time has passed that small details are flashing back into my memory."

Appellant and McClendon took the cashier and the two customers into the back office. Ellis said he did not know what happened in the back office because he was not present. He was the first one to leave the store because he "was spooked" and he "was not used to this situation with taking hostages and having these ... people involved in this crime...." He saw appellant and McClendon grabbing some movies and other items on their way out of the store. After that, the three of them returned to Ellis's mother's house and divided up the money and other items. Ellis estimated his share of the "loot" was "somewhere around $200." He also got some of the other items, including the vibrating sex toy referenced earlier.

Ellis testified that he cooperated with the Richardson police after his arrest, telling them everything he had told the jury and identifying appellant as a participant in the robberies. He also arranged the meeting where appellant was arrested. Ellis acknowledged he had a prior state jail felony conviction for credit card abuse and was twice convicted of possession of a controlled substance. He also admitted that, at the time of his arrest, he had a sticker on a mirror in his bedroom that said "licks and tricks," and explained that a "lick" is either a robbery or "some kind of hustle," and a "trick" is a prostitute. He added that those words were displayed on his mirror because he was once proud of the life he led, but was no longer proud of it. He testified that he had not yet entered pleas to the charges against him but the prosecutor indicated she would consider recommending probation if he testified truthfully.

Ellis identified six letters he received from appellant while incarcerated. Ellis explained that, in those letters, appellant asked him "to take the fall for this case or to give over Sleepy, who is the real culprit." When asked who Sleepy was, appellant replied, "I do not know." He also testified that one of the letters he received

(State's exhibit 85) made threats against his mother. That letter included a photocopy of Ellis's mug shot, above which was printed the words, "stop-snitching," followed by his jail book-in number and date of birth. Next to that was Ellis's mother's name, her Farmers Branch address (which was also Ellis's address), her date of birth, and her driver's license number. The letter said, among other things, "Take your licks … stop-snitching," that Ellis was "the KEY State's witness against me," and concluded: "[H]ere's the paperwork proof he fucked over me and has made a deal to testify and lie on me[.] [T]his is a picture of him[,] so put it out there…." On cross-examination, however, Ellis acknowledged that the letter threatening his mother did not come in an envelope and did not have appellant's return address on it. Ellis assumed appellant wrote it. Ellis also testified that appellant had been a mentor and looked out for him, and that he once saved Ellis's life. Ellis did not recall telling the police there was no mastermind. In addition, defense counsel pointed out that Ellis's life was "on the line" and asked, "You are going to do what you've got to do, right?" Ellis replied, "Yes."

After the State rested its case, the defense presented testimony from two witnesses: Jill Cramer, a forensic DNA analyst at Orchid CellMark, and Dr. Charles Weaver, III, a professor of psychology and neuroscience at Baylor University. Cramer testified that she performed "touch DNA" testing on specimens received from the Richardson Police Department. She compared a swab taken from the exterior door handle at the offense location with a swab collected from appellant. The door handle sample contained a mixture of at least two individuals, including at least one male, and appellant was excluded as a possible contributor of DNA to the sample. She acknowledged, however, that DNA test results did not prove appellant did not touch the door handle because the DNA could have been knocked off of or wiped from the surface area tested.

Weaver testified that he is memory researcher who has done research on eyewitness testimony as it relates to criminal cases. He discussed various factors that can influence eyewitness testimony, such as stress, and testified that stress has a "very counter-intuitive effect on memory," i.e. "[a] little bit of stress improves your memory" "[b]ut too much stress, fear, anxiety, narrows your attention and actually impairs memory."  He described an effect known as "the weapon focus" that applies when "a crime is committed with a weapon present" and "your "attention is naturally drawn to the weapon … at the expense of your memory for everything else."

11

Weaver testified that, in a photographic lineup, "what you want is for people to make an instant, almost unconscious identification," and that "[p]eople can make comparative judgments ... and still come to the right answer," but such a lineup is more likely to produce unreliable results. He added that the episode in this case was "fairly brief," that "several of the witnesses saw only in the periphery where our vision is considerably less acute," and that this "was done in the presence of a weapon," which elevates a person's fear. The comments made by witnesses in this case, such as "the eyes jumped out at me" or "I will never forget that nose," indicated they used "comparative analysis" rather than making a "quick holistic statement." Weaver addressed cross-racial identifications, noting that individuals "are about 50 percent less likely to make correct identifications and 50 percent more likely to make false alarms to opposite race suspects." He also noted that "[m]emories decline with the passage of time unless something intervenes to stop that."

At the conclusion of the testimony and arguments of counsel, the jury found appellant guilty in all three aggravated robbery cases. Appellant pleaded not true to the two enhancement paragraphs that alleged prior felony convictions for (1) possession of a controlled substance with intent to deliver over four grams and (2) aggravated robbery. The State subsequently presented punishment evidence. The jury found the enhancement paragraphs true and imposed a punishment of fifty-five years' imprisonment in each case. The trial court ordered the sentences to run concurrently. Appellant filed a motion for new trial alleging ineffective assistance of counsel. The trial court held a hearing on the motion and, after hearing evidence, denied it.

*Murray v. State*, 2014 WL 2568492 at *1-*8.

### III. Discussion

**1.    Standard of Review**

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of

1996 (the "AEDPA"), 28 U.S.C. § 2254, provide:

> (d)    An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on

the merits in State court proceedings unless the adjudication
of the claim –

(1)      resulted in a decision that was contrary to, or involved
          an unreasonable application of, clearly established
          Federal law, as determined by the Supreme Court of the
          United States; or

(2)      resulted in a decision that was based on an
          unreasonable determination of the facts in light of the
          evidence presented in a State court proceeding.

*See* 28 U.S.C. § 2254(d). Under the "contrary to" clause, a federal habeas court

may grant the writ of habeas corpus if the state court arrives at a conclusion

opposite to that reached by the United States Supreme Court on a question of law

or if the state court decides a case differently from the United States Supreme

Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S.

362, 413 (2000). Under the "unreasonable application" clause, a federal court

may grant a writ of habeas corpus if the state court identifies the correct

governing legal principle from the United States Supreme Court's decisions, but

unreasonably applies that principle to the facts of the prisoner's case. *Id.*

**2.      Ineffective Assistance of Counsel**

          Petitioner claims he received ineffective assistance of counsel. To sustain a

claim of ineffective assistance of counsel, Petitioner must show that: (1) counsel's

performance was deficient; and (2) the deficient performance prejudiced the

defense so gravely as to deprive Petitioner of a fair trial. *Strickland v.

Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Court stated that

"[j]udicial scrutiny of counsel's performance must be highly deferential" and

"every effort [must] be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Courts, therefore, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Even if counsel is proven deficient, a petitioner must prove prejudice. To prove such prejudice, Petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 694). "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong." *Id.* "Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

**(A)   Extraneous Offense Evidence**

Petitioner argues his counsel was ineffective when counsel failed to object to extraneous offense evidence at the punishment stage. Petitioner contends counsel should have immediately objected when Detective Perry read from a State exhibit regarding a previous offense by Petitioner. Detective Perry testified as follows:

> According to a Corsicana Police Department offense report on 5/9/94, in Corsicana, Texas, during the daytime hours, inmate Murray assaulted an 82-year-old white female by running up behind her and pushing her to the ground. The report indicated that inmate Murray then stole the victim's purse, containing approximately $30,

and then fled the scene on foot. The report indicates that the victim,
Elizabeth Gaiter (phonetic) sustained a fractured hip as a result of
this robbery. The injury required open surgical repair and resulted in
a three-week hospital stay. Her medical expenses were in excess of
$21,000, with future bills expected. Inmate Murray claimed that he
was arrested on 7/25/95, by Corsicana police without incident.

(ECF No. 13-17 at 38.) As soon as Detective Perry finished reading, the judge
stopped the trial for lunch. When the trial resumed, defense counsel objected to
Detective Perry's testimony. (*Id.* at 39.)  The court sustained the objection.
Defense counsel then requested that the jury be instructed to disregard the
testimony. The court granted the motion and instructed the jury as follows:

> All right. Ladies and gentlemen, occasionally from time to time in a
> trial, evidence is brought before you which should not be brought
> before you. That happened in this case with the last bit of evidence
> that this detective was reading from State's Exhibit No. 215. I am
> instructing you not to consider that for any purpose. I have sustained
> the objection that it was hearsay and it's not subject to confrontation.
> In the most strongest terms possible, I'm instructing you to not
> consider that for any purpose in any sentence that you eventually
> assess.

(*Id.* at 39-40.)  Defense counsel also moved for a mistrial, which the court denied.
(*Id.* at 40.)

Petitioner argues counsel should have objected to Detective Perry's
punishment testimony earlier. On state habeas review, defense counsel
responded to Petitioner's claim. Counsel stated:

> When we came back from recess, that is when I lodged my objection
> and as I stated it was granted and I got the instruction and
> everything and that's how it broke down.

* * *

15

> Well, to be fair, I let too much time go. I'm not going to sit here and quibble. I would like to have objected faster looking back on it. I had my reasons at the time as to why I didn't jump up in the middle of testimony but it is what it is.

(ECF No. 14-3 at 28-30.)

The Court finds that although defense counsel could have objected earlier to Detective Perry's testimony, counsel still obtained an instruction from the court for the jury to disregard the testimony. The court's instruction specifically admonished the jury in strong terms that it was not to consider the objectionable evidence. Juries are generally presumed to have followed the trial court's instructions. *See Charles v. Thaler*, 629 F.3d 494, 500 (5th Cir. 2011) (citing *Galvan v. Cockrell*, 293 F.3d 760, 765 (5th Cir. 2002)). The Court finds that the state court's denial of this claim was not unreasonable.

### (B)   Discovery Packet

Petitioner claims his counsel was ineffective when counsel gave a discovery packet to a jailer who was a potential State's witness. At the motion for new trial hearing, defense counsel responded as follows:

> Okay. First, Mr. Murray talked about the discovery. He complained that I tendered his discovery packet to the sheriff and that a potential State's witness in the case, Jailer B. Brown, was able to get his hands on that discovery and review it before finally giving it to him. On that day -- first off, Mr. Brown, Dock Murray had told me previously that Jailer Brown had made contact with him and had given him a hard time about the case before the discovery was tendered. I notified the State that a potential State's witness was having contact with my client in the jail and both the State and I, [Prosecutor] Ms. Summer Elmazi, agreed that we should ask the sheriff's department to transfer Dock Murray away from Jailer Brown or transfer Jailer Brown away from Mr. Murray. At the time I was finally able to

tender discovery to Mr. Murray I was under the impression, based upon what the sheriff told me, that Jailer Brown and Mr. Murray had no contact at all at that point. At the time I took the discovery it was just what had been tendered to me by the State, which is police reports, et cetera. There was no confidential communication, there was no attorney work product, there were no letters from me. It was all State's documentary evidence. I went to wait for Mr. Murray. As is customary procedure, the sheriff deputy there on duty asked me if I had anything for Mr. Murray to sign. The importance of that is, if you have something for them to sign, they will unlock the window and pass it over directly to Mr. Murray or the defendant and have him sign it and return it. I stated, no, I did not have anything for him to sign and so the customary procedure is for you to hand whatever documents you have to the deputy there behind the glass. I asked to hold onto the discovery and wait for Mr. Murray to go over it in person. I waited approximately 30 to 45 minutes. I had a hearing coming up and did not have time to wait any further. I finally gave it to the deputy, which was customary procedure. So I had no way of knowing that Jailer B. Brown was going to get his discovery. And, for the record, the person I gave it to was not B. Brown.

(ECF No. 14-3 at 13-14.)

Petitioner has failed to show that he was prejudiced by counsel's actions. He has not shown that any attorney-client privileged communications or attorney work product materials were provided to Jailer Brown. Nor has he shown that any negligence by his counsel in handling the discovery materials had an adverse effect on his defense. Petitioner's claim should be denied.

### (C)    Conflict of Interest

Petitioner claims his counsel had a conflict of interest because counsel and the prosecutor where involved in a romantic relationship and had a personal vendetta against him. In the motion for new trial hearing, defense counsel testified that he and the prosecutor never had any romantic relationship, and that

there was no personal vendetta against Petitioner. (ECF No. 14-3 at 23-24.)  The prosecutor also filed an affidavit rebutting Petitioner's claims. (ECF No. 14-4 at 23.)  She stated Petitioner's claims were "bogus" and had "no foundation."  (*Id.*)  Petitioner has submitted no evidence to support his claims. His conclusory allegations are insufficient to raise any constitutional violations and should be dismissed. *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings).

### (D)   Left the Courtroom

Petitioner claims his counsel was ineffective when one of his attorneys left the courtroom during trial. (ECF Nos. 3 at 6 and 19 at 4.)  Petitioner does not explain when during the trial this occurred, how long his attorney was absent, or how he was prejudiced by the absence. He also does not allege he was without any counsel during the trial. Petitioner's conclusory claim should be denied. *Id.*

### (E)   Failed to Present Material Evidence

Petitioner argues his counsel was ineffective when counsel failed to present the following evidence: (1) letters from his co-defendants stating Petitioner was innocent; (2) testimony that co-defendant Eric Ellis was a heroin dealer; (3) testimony from Petitioner's wife, Misty Murray, who was his alibi witness; (4) testimony from Temontray Minafee to impeach co-defendant Tommy McClendon; and (5) medical records showing Petitioner suffered injuries when Detective Perry allegedly stomped and kicked him.

### (i)    Letters from Co-Defendants

Petitioner states defense counsel should have admitted letters written by from his co-defendants Tommy McClendon and Eric Ellis stating he did not commit the offense.

Defense counsel testified at the motion for new trial hearing that Petitioner gave him letters from McClendon and Ellis in which they both stated Petitioner was innocent of the offense. (ECF No. 14-3 at 19.)  Counsel stated that McClendon and Ellis would not talk to him before trial. (*Id.*)  At trial, counsel questioned McClendon and Ellis about their letters, and they both admitted writing letters exonerating Petitioner. (ECF No. 13-14 at 151; ECF No. 13-15 at 57.)  Defense counsel stated he did not introduce the letters into evidence because they were inadmissible since both witnesses admitted making the prior statements. (ECF No. 14-3 at 20); *See* Tex. R. Evid. 613(c) ("A prior statement of a witness which is consistent with the testimony of the witness is inadmissible except as provided in 801(c)(1)(B)"). Petitioner has failed to establish the letters were admissible or that his counsel was ineffective for failing to offer them as evidence.

### (ii)    Eric Ellis

Petitioner argues counsel should have elicited testimony from Ariel Woods that co-defendant Ellis was a drug dealer. Defense counsel testified at the motion for new trial hearing that Petitioner told counsel that Petitioner and Ariel Woods were going to Ellis's house to do a drug deal. (ECF No. 14-3 at 15.)  Counsel stated

it was trial strategy not to elicit this testimony because counsel did not want to the jury to hear about Petitioner's drug activity. (*Id.*)  Petitioner has failed to show his counsel's conduct fell outside of reasonable trial strategy. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) ("We must strongly presume . . . that the challenged conduct was the product of reasoned trial strategy.") (citing *Strickland*, 466 U.S. at 690).

### (iii)  Misty Murray

Petitioner claims his counsel was ineffective when counsel failed to call Petitioner's wife, Misty Murray, as a witness. Petitioner states Murray could have provided an alibi for Petitioner and would have also testified that Petitioner did not live at the Budget Suites Motel.

At the motion for new trial hearing, defense counsel explained why he did not call Misty Murray as a witness. Counsel stated:

> Dock's wife, Misty, was a central figure in our defense strategy from the very beginning. My office, my investigator, I and my paralegal, Trish Hudson, had numerous points of contact with Misty. We had planned on using her as a witness.

> In June 2012, by that time we had been informed that there was a series of jail phone calls both from Mr. Murray's hand and then also from other hands that the State was going to allege was Dock Murray. In those phone calls, which were tendered to me and I reviewed, it appeared clear to me that the allegation would be that Dock Murray was tampering with Misty Murray as a witness.

> [Prosecutor] Summer Elmazi told me directly that, if Misty Murray took the stand, she would consider filing perjury charges on her if she testified to what was on the phone call.

> In June 2012, I explained all of this to Dock Murray and, I believe,
> Clifford Duke was present at that time too. We all agreed that calling
> her in the guilt/innocence phase would open the door to those calls.
> That those calls would include allegations of extraneous criminal
> conduct and that it would be best to limit the jury's hearing of
> extraneous offenses. At that point Mr. Murray agreed with that as far
> as our strategy.
>
> In November of 2012, Mr. Murray told me that he changed his mind,
> that he absolutely wanted Misty to testify, that she was central to his
> defense, and he was not worried about her getting a perjury charge.
>
> At that point Misty Murray was asking me repeatedly for legal advice
> as far as what she should do. She asked Marissa Wallace, my
> investigator, for advice as to whether or not she should testify and
> what would happen to her if she did testify. Being that I felt I had a
> conflict of interest and anyone attached to my office would have a
> conflict of interest, I advised through my investigator that Misty seek
> independent counsel. At one point I was told, I believe, by Dock that
> Misty had hired Phillip Hayes as counsel. We checked with Mr.
> Hayes' office and he had, in fact, not been hired.
>
> Ultimately, in December of 2012, Dock told me that Misty was,
> quote, gone. She would not be testifying. That she, quote, knew to
> stay away.

(ECF No. 14-3 at 16-18.) Additionally, the prosecutor submitted an affidavit

stating Petitioner had been indicted for witness tampering based on Petitioner's

recorded jail phone calls with Misty Murray. (ECF No. 14-4 at 21-22.)  The

prosecutor stated Petitioner's "plan was for [Misty] to lie on the stand at

[Petitioner's] behest."  (*Id.*)

Complaints of uncalled witnesses are not favored in federal habeas corpus

review because the presentation of testimonial evidence is a matter of trial

strategy and because allegations of what a witness would have stated are largely

speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). To prevail on

an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must (i) name the witness; (ii) demonstrate that the witness was available to testify and would have done so; (iii) set out the content of the witness's proposed testimony; and (4) show that the testimony would have been favorable to a particular defense. *Id.* Here, Petitioner has failed to show that Misty Murray was available to testify at trial and would have do so. He further has not shown counsel's decision not to call Misty Murray was not the result of a reasonable trial strategy. This claim should be denied.

### (iv)  Temontray Minafee

Petitioner states his counsel should have called Temontray Minafee as a witness. Minafee shared a cell with co-defendant McClendon. Petitioner claims Minafee wrote him letters alleging that the State offered McClendon a plea bargain to lie and claim that Petitioner committed the offense.

At the motion for new trial hearing Defense counsel responded by stating:

Dock testified to this name [Temontray Minafee] at the hearing. I had never gotten that name. I searched -- one, I don't remember that name. Two, I searched my notes and I take extremely copious notes on cases. That name appears nowhere in my notes nor in my investigator's file. But I do remember him talking about cellmates of Tommy's and how they could corroborate the letter that Tommy had written, so I didn't have that name specifically. But I did know about cellmates previously. We had agreed prior, the main thing Dock wanted was that those letters be heard. He wanted Tommy's letter and Eric's letter saying he didn't do these offenses, saying they would clear his name to come into evidence. So we agreed that that was the most powerful evidence directly out of a horse's mouth and calling other people to back up evidence that we already had would be counter-productive, not counter-productive but unnecessary.

(ECF No. 14-3 at 18.)

The record shows defense counsel cross-examined co-defendants Tommy McClendon and Eric Ellis about their letters, and that each of them admitted they had written letters exonerating Petitioner. (ECF No. 13-14 at 151-52, 160-62; ECF No. 13-15 at 41-45. 57-58.) Petitioner has failed to the show that counsel's conduct fell outside of reasonable trial strategy.  Petitioner's claim should be denied.

### (v)    Medical Records

Petitioner argues his counsel was ineffective by failing to admit his medical records into evidence. Petitioner claims the medical records would have showed that Detective Perry stomped and kicked him in an effort to force him to sign a confession.

At the motion for new trial hearing, defense counsel responded as follows:

> Early on Dock told me that Detective Perry, the lead Richardson Police Department detective, had beat him up at the time of his arrest and that he had been sent to the hospital because of that. Dock gave to me medical records that he said showed that he had been beaten up and that he had been urinating blood as a result of that assault. I got the -- I reviewed those records. It was a three or four page record from Richardson. It was not, in fact, a medical record but was discharge instructions essentially. It stated that the patient, Dock Murray, had reported blood in his urine but they had not found any blood in his urine when they analyzed him. It also failed to document any sorts of injuries, any sorts of trauma and said that he was released in stable condition. I had my investigator subpoena further medical records related to that stay but none existed. I didn't have anything to use there.

(ECF No. 14-3 at 20.)

Petitioner has failed to establish that his medical records supported his claim that he was stomped or kicked by Detective Perry or anyone else. His ineffective assistance of counsel claim should be denied.

### (vi)    Identification Card

Petitioner claims counsel should have introduced evidence that an identification card in his name found at the Budget Suites Motel was a Texas prison identification card rather than a Department of Motor Vehicles identification card. Petitioner apparently contends this evidence would have bolstered his claim that he did not live at the Budget Suites Motel. Defense counsel testified at the motion for new trial hearing that he filed a motion *in limine* to exclude this information because it would have showed Petitioner was previously convicted of a felony. (ECF No. 14-3 at 16.)  Petitioner has failed to show his counsel's conduct fell outside of reasonable trial strategy.

### 3.    Trial Court Error

Petitioner argues the trial court erred when it denied his challenges for cause against prospective jurors Erol Arkan, Linda Whitworth, and Michael Golubski. Although Petitioner struck each of these potential jurors, he argues that if the court had properly granted his strikes for cause, he could have used his preemptory challenges against other potential jurors.

Petitioner's claim is not cognizable on federal habeas review. These potential jurors were not selected for the jury, and the forced use of state peremptory challenges to remove a potential juror does not raise a constitutional

claim for federal habeas relief. *See Ross v. Oklahoma,* 487 U.S. 81, 86 (1988). The Supreme Court has stated:

> Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension.

(*Id.* at 88) (citations omitted); *see also Allen v. Stephens*, 805 F.3d 617, 634 (5th Cir. 2015), *abrogated on other grounds*, 138 S. Ct. 1080 (Mar. 21, 2018)  (same). Petitioner's claim should be denied.

## 4.   Actual Innocence

Petitioner claims he is actually innocent because the evidence was insufficient to support the conviction. A claim of actual innocence must be based on reliable evidence *not* presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence means "factual innocence" and not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623-24 (1998); *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999). Thus, where a petitioner asserts his actual innocence of the crime, he must show, as a factual matter, that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition. *Schlup*, 513 U.S. at 327. Petitioner presents no new evidence in support of his claim. Therefore, Petitioner's claim should be denied.

Further, Petitioner's insufficiency of the evidence claim is without merit. A federal court may not disturb a conviction in a state criminal proceeding unless

no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gibson v. Collins*, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict. *Jackson*, 443 U.S. 319; *Gibson*, 947 F.2d at 781.

Under Texas law, a person commits aggravated robbery if he commits robbery and "uses or exhibits a deadly weapon." Tex. Penal Code Ann. § 29.03(a)(2). A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* at § 29.02. A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." *Id.* at § 31.03(a).

A "deadly weapon" is "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* at § 1.07(a)(17).

Petitioner claims the evidence was insufficient to show (1) that the BB gun was a deadly weapon; and (2) that he was the person committing the robbery and holding the BB gun.

The Court finds the evidence was sufficient to support the deadly weapon finding. Laura Fleming, the State's firearms examiner, testified that the BB gun was in good working condition. (ECF No. 13-14 at 112.)  She stated the operations manual contained warnings that misuse or careless use of the gun could cause serious injury or death. (*Id.* at 116.)  She testified the gun was a high power air gun, and that her research showed it could cause serious injury or death. (*Id.* at 116-17.)

"The State is not required to show that the 'use or intended use causes death or serious bodily injury' but that the 'use or intended use is *capable* of causing death or serious bodily injury.'"  *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (quoting *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)). Further, "[w]ith testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding." *Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002).  Viewing this evidence in a light most favorable to the verdict, Petitioner has failed to show the State's denial of this claim was unreasonable.

The evidence was also sufficient to support the finding that Petitioner committed the offense. Witness Sheresa Tuggle testified that Petitioner and his co-defendants did not have their faces covered during the robbery, and that she saw Petitioner's face during the robbery. (ECF No. 13-12 at 32.)  She identified Petitioner from a photo lineup prior to trial and stated she was fifty percent sure that the person she identified was the robber. (*Id.* at 39-42.)  She also identified

Petitioner at trial. Witness Kyle Shubel testified that he saw Petitioner's face during the robbery and that Petitioner had a gun. (*Id.* at 106-07.)  Prior to trial, Shubel identified Petitioner from a photo lineup, and stated he was over fifty percent sure that Petitioner was the robber. (*Id.* at 112-13, 118-19.)  He identified Petitioner at trial and testified he was "more sure" that Petitioner was the robber after seeing him in person at trial. (*Id.* at 125.)  Witness Tara Mitchell testified that during the robbery she saw that Petitioner had a tattoo or scar under his eye, and that he had a gun. (*Id.* at 137-139.)  Prior to trial, Mitchell identified Petitioner from a photo lineup and stated she was 100 percent sure Petitioner was the robber. (*Id.* at 143.)  She also identified Petitioner at trial. (*Id.* at 142.)

Petitioner's co-defendants Tommy McClendon and Eric Ellis testified that Petitioner participated in the robbery, and Ellis testified Petitioner had a BB gun during the robbery. (ECF No.13-14 at 129-38; ECF No. 13-15 at 13-28.)  Although both McClendon and Ellis stated they wrote letters prior to trial exonerating Petitioner, they each testified at trial that they wrote the letters because they felt threatened by Petitioner. (ECF No. 13-14 at 147, 151-52; ECF No. 13-15 at 37-39, 57-58.)  Petitioner's fingerprints, however, were not found on the door to the store. (ECF No. 13-15 at 94-95.)  A defense expert also testified that a witness's memory can degrade over time. (*Id.* at 121-147.)  The expert also testified about the difficulties in obtaining accurate eyewitness identification. (*Id.*)

Viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime of aggravated

robbery beyond a reasonable doubt. Thus, the Court finds the State court's decision to deny relief was not unreasonable.

## 5.    *Brady* Evidence

Petitioner claims the prosecutor suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner states the prosecutor withheld jail phone recordings of his two co-defendants, and that the recordings would have showed that Petitioner was not involved in the robbery. (ECF No. 19 at 17-18.)

To establish a *Brady* claim, Petitioner must show that the prosecution suppressed favorable, material evidence that was not discoverable through due diligence. *Brady*, 373 U.S. at 87. Evidence is "material" if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defendant. *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999).

On state habeas review, the prosecutor submitted an affidavit rebutting Petitioner's claims. The prosecutor stated:

> Regarding the issue that I suppressed county jail recorded telephone conversations of the codefendants that reveal conversation between family, friends, and loved ones that attest to the defendant's non-involvement in their criminal activities, this not true. It *is* part of my policy and practice to make available and/or tender all discovery, including discovery from related codefendants. In this case, I made available the jail calls of defendant Murray and his codefendants, Ellis and McClendon. I also made available jail calls that defendant made on the jail pin numbers of other unrelated inmates to the defense counsel. Moreover, I listened to jail calls from the codefendants and did not learn any information of either

> codefendant that was related to these offenses or that could have
> been Brady. If there had been conversations or dialogues within the
> jail calls of the codefendants that would have been Brady, whether
> this means exculpatory or inculpatory, it is my practice to make this
> available to the defense attorney.
>
> Ellis and McClendon did make jail calls while they were in custody.
> However, the codefendants did not have conversations in which they
> stated or implied that defendant Murray lacked any involvement in
> the abovementioned offenses. Nonetheless, I made these calls
> available to defense counsel and his assistant, Trish Hudson [State's
> Exhibit No.2]. In addition, I have attached the State's Notice of
> Discovery signed on December 27, 2012 and filed with the Court on
> December 29, 2012 [State's Exhibit No.1]. I continued to make these
> jail calls available until the trial date [State's Exhibit No. 1 and 4).
> Furthermore, in this particular case, discovery was so voluminous
> that I also allowed defense counsel the opportunity to physically go
> through my trial file, which consisted of three file boxes, for all three
> defendants. It was also my practice to email defense counsel
> discovery as I received it, which included emails on May 03, 2012,
> October 08, 2011, December 05, 2012, and December 20, 2012.
> [State's Exhibit No. 2, 3, 4, and 5). I made jail calls of all three
> defendants available to defense counsel. I neither concealed nor
> failed to disclose any recorded telephone conversations that the
> defendant is claiming, especially codefendant conversations that
> defendant Murray lacked any involvement in the abovementioned
> offenses.

(ECF No. 14-15 at 13-14.)

Petitioner has submitted no evidence supporting this claim. His

conclusory allegations should be denied. *Ross*, 694 F.2d at 1012.

**6.    Summary**

Petitioner is lawfully restrained because he has failed to prove that he has

been denied a constitutionally protected interest. Accordingly, the state courts'

decision to deny relief is not contrary to or does not involve an unreasonable

application of clearly established federal law and is not based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings.

## IV.  Recommendation

Because Petitioner failed to make a substantial showing of the denial of a federal right, the Court should DENY with prejudice his petition for writ of habeas corpus.

Signed June 14, 2018.

_____
REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The Court directs the United States District Clerk to serve on the parties a true copy of the Findings, Conclusions, and Recommendation of the United States Magistrate Judge. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these Findings, Conclusions, and Recommendation must serve and file written objections within 14 days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these Findings, Conclusions, and Recommendation will bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the Findings, Conclusions, and Recommendation within 14 days after being served with a copy will bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).